UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-21084-SCOLA/TORRES

CHABAD CHAYIL, INC.,

    Plaintiff,

v.

THE SCHOOL BOARD OF MIAMI-DADE COUNTY FLORIDA, and
MIAMI DADE COUNTY, FLORIDA,

    Defendants.
_____/

## REPORT AND RECOMMENDATION ON MOTION FOR PRELIMINARY INJUNCTION

This matter is before the Court on Chabad Chayil, Inc.'s ("Plaintiff" or "Chabad") amended motion for preliminary injunction against the School Board of Miami-Dade County Florida ("MDCPS"). [D.E. 34]. MDCPS responded to Plaintiff's motion on July 17, 2020 [D.E. 47] to which Plaintiff replied to on July 24, 2020 [D.E. 48]. Therefore, Plaintiff's motion is now ripe for disposition.[1] After careful consideration of the motion, response, reply, and the record, we **RECOMMEND** that the motion be **DENIED**.

---

[1] On July 2, 2020, the Honorable Robert N. Scola, Jr. referred this motion to the undersigned Magistrate Judge for disposition. [D.E. 36].

## *I.   BACKGROUND*

Chabad is a Florida not-for-profit corporation created to conduct Jewish outreach in northeast Miami-Dade County in accordance with the principles of the Chabad-Lubavitch movement. As part of this mission, Chabad ran the Community Hebrew Afterschool Program ("CHAP") at Aventura Waterways K-8 Center ("AWK8") and at Virginia A. Boone/Highland Oaks Elementary School ("VABHOE") until the 2019-2020 school year. Both schools operate under MDCPS's jurisdiction. CHAP started at AWK8 during the 2008-2009 school year and expanded to VABHOE during the 2016-2017 school year. CHAP includes: (1) a Jewish story hour; (2) Hebrew reading, writing, and conversation; (3) Hebrew history; (4) traditions classes; (5) Jewish Holiday classes; and (6) other classes and activities about Jewish and Hebrew topics.

In 2017, MDCPS's Office of Inspector General ("OIG") received a complaint alleging that Chabad had been improperly applying to use the facilities at AWK8 and VABHOE for CHAP. For instance, from 2010 through the 2018-2019 school year, Chabad applied through successive Temporary Use Agreements ("TUAs") for each school. These short-term applications were allegedly not the proper application process for after school child-care programs because MDCPS did not properly verify if Chabad met certain requirements mandated by the Florida Department of Children and Families ("DCF"). According to the complaint, Chabad received improper assistance from a MDCPS Board Member, Dr. Martin Karp, and his Chief of Staff, Jerold Blumstein, to get each TUA approved. The complaint further alleged that

Chabad made misrepresentations on the TUAs by claiming it did not charge fees for CHAP when it did.  These apparent misrepresentations were significant because it resulted in Chabad allegedly receiving erroneous rental-fee waivers from MDCPS.  To verify the allegations in the complaint, the OIG completed an almost two-year-long investigation.  While the OIG investigation progressed, MDCPS allowed Chabad to run CHAP at AWK8 and VABHOE without paying rental fees, and there seemed to be no question that Chabad was then meeting DCF requirements.

A few months before the 2019-2020 school year began, the OIG sent Chabad a Draft Report that contained the results of its investigation.  The Draft Report mostly confirmed the allegations in the complaint.  It concluded that Chabad did not follow proper MDCPS procedure when applying to use facilities at AWK8 and VABHOE and misrepresented that CHAP was free of charge.  According to the OIG, Chabad's alleged wrongdoings allowed it to avoid paying MDCPS approximately $1.3 million in rental fees and allowed it to operate CHAP for at least a few years without a DCF child-care license and without conducting proper DCF level 2 background checks on its staff.  The OIG claimed that Chabad should have been first selected and authorized by MDCPS to operate as an after-school care provider through MDCPS's Requests for Proposals ("RFP") process.  Once approved by this process, Chabad should have then entered into an affiliate agreement with MDCPS instead of TUAs.  If Chabad had gone through the proper channels, the OIG asserted that Chabad would not have been allowed to bypass MDCPS's established protocols and operate an unlicensed child-care program.

Before publicly releasing a Final Report, the OIG allowed Chabad to submit a response, which Chabad did on July 31, 2020. Chabad's 30-page response, with 354 pages of exhibits, categorially denied almost all the findings in the Draft Report. Most importantly, Chabad denied two serious allegations. First, Chabad claimed that it did not collect any fees from participants of CHAP related to using MDCPS's facilities. And any instance where it claimed it charged fees was because either The Children's Trust, one of its main funding sources, or MDCPS asked it to. Further, Chabad claimed it waived fees for participants who could not afford them. Second, Chabad asserted that it was exempt from DCF licensure requirements and thus did not need to conduct DCF compliant background checks on its staff, so its background check process was proper.

While Chabad waited for the Final Report to be released, it used MDCPS's online reservation system to request space at AWK8 and VABHOE to run CHAP for the 2019-2020 school year. One day before school started, however, MDCPS notified Chabad that it would not be permitted to use MDCPS's facilities based on the Draft Report. Shortly thereafter, on September 25, 2019, the OIG released the Final Report. The Final Report is substantially the same as the Draft Report, because for the most part, the OIG found Chabad's response unsupported by facts and inconsistent with the information derived from the many interviews the OIG conducted during its comprehensive investigation.

For example, the OIG determined that Chabad only provided evidence that it charged fees for other services unrelated to using MDCPS's facilitates and that it

4

waived some fees.  This evidence was insufficient to change the OIG's conclusions for three primary reasons.  First, the OIG noted that Chabad admitted that most parents pay $50 a month for CHAP.  Second, Chabad advertised a registration fee of $125 plus a monthly fee donation for CHAP at AWK8 and sliding scale fees at VABHOE.  Third, Dr. Karp stated that he paid registration fees and monthly donations for his children to attend CHAP.  Moreover, the OIG found Chabad's argument that it was required to charge fees based on the The Children's Trust requirements inconsistent with the interviews of The Children's Trust staff.  Specifically, the four people interviewed at The Children's Trust denied that anyone instructed Chabad to list any type of fees on its application for funding or that an applicant was required to charge any fees to receive funding.

In addition, Chabad failed to support its argument that it had a DCF license exemption with proper documentation.  Instead, Chabad submitted a single undated DCF exemption letter that refers to a program at a non-public school and a licensure survey conducted by Chabad.  Chabad did not include a copy of the licensure survey, the basis for the exemption letter.  Based on the letter alone, the OIG thus did not know if DCF was even aware of CHAP when Chabad received the exemption letter or when the exemption was applicable.  Critically, the OIG met with a DCF supervisor during its investigation who claimed that the undated DCF exemption letter submitted by Chabad was unrelated to CHAP.  The DCF supervisor also stated that CHAP would have never qualified for an exemption from licensing because it operated at a public school and was an outside organization.  Because of these

findings, the OIG concluded that Chabad should have conducted DCF level 2 background checks, which it did not do. The OIG also determined that Chabad did not provide its staff with duly issued MDCPS identification badges, which was MDCPS policy. After the Final Report was released, MDCPS notified Chabad that it could not offer CHAP at its schools.

Nevertheless, there were conversations about Chabad applying to use facilities at AWK8 and VABHOE to run CHAP through the proper application procedures outlined in the Final Report. Part of these conversations included two emails exchanged between MDCPS attorneys, Mr. Walter Harvey and Mr. Luis Garcia, on October 9, 2019. In the first email, Mr. Harvey noted that according to Chabad's application to receive funding from The Children's Trust, Chabad taught the Jewish religion at CHAP. Mr. Harvey then posed the question: could MDCPS enter into an affiliate agreement with an entity for the purpose of teaching Judaism in light of the Establishment Clause of the U.S. Constitution? In response, Mr. Garcia noted that other after-school programs operated by religious organizations did not teach religion as part of their programs, and based on his understanding, MDCPS could not enter into an affiliate agreement because it would violate the Establishment Clause. This email correspondence was not shared with Chabad until it was apparently obtained in connection with this litigation. There is also no evidence that Chabad ever applied to use facilities at MDCPS through an affiliate agreement.

Then on March 11, 2020, Chabad filed a complaint in this Court. [D.E. 1]. The next day, Chabad moved for a preliminary injunction. [D.E. 3]. After both motions

were fully briefed, Chabad filed an amended complaint on June 11, 2020 [D.E. 27] and an amended motion for preliminary injunction on June 26, 2020 [D.E. 34]. A significant change in the amended motion for preliminary injunction was to remove the reference to the 2019-2020 school year regarding injunctive relief, meaning the amended motion desires indefinite injunctive relief. The amended complaint seeks damages against MDCPS and the OIG under 42 U.S.C. § 1983 for alleged violations of its First Amendment rights to free exercise and free expression, and its Fourteenth Amendment rights to equal protection and due process. It also asserts pendant state law claims for alleged violations of the Florida Constitution and the Florida Religious Freedom Restoration Act. These claims are based on Chabad's allegations that MDCPS denied its application to run CHAP because it teaches religion, that it was not given a fair opportunity to respond to the Draft Report, and that MDCPS allows other entities that run after-school programs at MDCPS to receive fee waivers when they accept donations for the programs.

Chabad thus desires a mandatory preliminary injunction to resume CHAP at AWK8 and VABHOE immediately and indefinitely.[2] In its amended motion, Chabad makes arguments similar to the ones it made in its response to the Draft Report, that (1) MDCPS instructed Chabad which forms to use for it to gain access to MDCPS's facilities; (2) MDCPS initiated fee waivers on Chabad's behalf because of the value Chabad provided to MDCPS students, parents and the community at large; (3)

---

[2] Chabad acknowledges that MDCPS is currently not allowing any in-person after school programs to operate due to COVID-19 but seeks to conduct the program virtually for now and in-person as soon as the schools reopen in Miami-Dade County.

7

MDCPS specifically asked Chabad to charge certain fees and told Chabad that it could accept donations for CHAP; (4) after the OIG began its investigation, MDCPS confirmed to Chabad that its registration forms and fee structure complied with MDCPS regulations; and (5) MDCPS is wrongfully penalizing Chabad for MDCPS's failure to follow its own policies as calculatedly and tactically interpreted by the OIG.

MDCPS opposes Chabad's request for preliminary injunction because, among other reasons, it would require MDCPS to allow Chabad to operate CHAP without complying with the procedures designed to protect the school children entrusted to its care by the residents of Miami-Dade County.

## II.   STANDARD OF REVIEW

A moving party must demonstrate the following elements to obtain a preliminary injunction: (1) substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the potential harm to the defendant; and (4) that injunction will not disserve the public interest. *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002); *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001). A preliminary injunction is "an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the 'burden of persuasion' as to the four prerequisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1988); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("Because a preliminary injunction is an extraordinary and drastic remedy, its grant is the exception rather than the rule.") (internal quotation omitted).

The goal of a preliminary injunction is to prevent irreparable harm and to "preserve the district court's power to render a meaningful decision after a trial on the merits." *Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). Of the four prerequisite elements a moving party must show before entry of a preliminary injunction, "the first factor, establishing a substantial likelihood of success on the merits, is most important." *ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1294 (S.D. Fla. 2008). "If the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800-Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (citing *Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001)). "Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel*, 234 F.3d at 1176.

When an injunction does more than preserve the status quo, however, an even stronger showing is required. *See, e.g., Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958) ("A mandatory injunction . . . especially at the preliminary stage of proceedings, should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party."); *United States v. Board of Educ. of Green County, Miss.*, 332 F.2d 40, 46 (5th Cir. 1965) ("[M]andatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds").

### III.     ANALYSIS

#### A.     *Substantial Likelihood of Success on the Merits*

Beginning with the first prerequisite for the issuance of a preliminary injunction, the Court must consider whether Plaintiff has proven a substantial likelihood of success on the merits. To establish a substantial likelihood of success on the merits, Plaintiff must demonstrate a likelihood of success at trial as to both its prima facie case and the affirmative defenses asserted by the non-moving party. *See TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*, 102 F. Supp. 3d 1321, 1325 (S.D. Fla. 2015). If Plaintiff fails to demonstrate a "substantial likelihood of success on the merits" this alone defeats a motion for a preliminary injunction, regardless of the ability to establish any of the other elements. *See, e.g., McDaniel v. Crosby*, 194 F. App'x 610, 613 (11th Cir. 2006) (affirming denial of preliminary injunction because the plaintiff did not show a substantial likelihood that he would succeed on the merits); *see also Siegel*, 234 F.3d at 1176 (noting that "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper").

We thus first determine if Chabad is likely to succeed on the merits of its First Amendment claims. To do this, Chabad must initially show that MDCPS denied Chabad's request to use MDCPS facilities based on the religious content of Chabad's speech. *See Widmar v. Vincent*, 454 U.S. 263, 270 (1981) ("Here the [school] has discriminated against student groups and speakers based on their desire to use a generally open forum to engage in religious worship and discussion. These are forms

of speech and association protected by the First Amendment.") (citations omitted). Chabad has failed to demonstrate this initial threshold.

Chabad contends that based on the legal reasoning in the two emails sent between MDCPS's attorneys, MDCPS informed Chabad that it would not be allowed to use MDCPS's space. Indeed, Chabad's First Amendment claims at this stage rest entirely on this email exchange. However, these emails were sent *after* MDCPS had already denied CHAP's online reservation request to use MDCPS's facilities. Based on Chabad's own complaint, that denial was apparently rooted on the findings of the Final Report. And the Final Report's conclusions were not based on Chabad's religious speech nor the emails but on the verified allegations that Chabad charged fees for CHAP, did not have an adequate DCF exemption, and did not conduct adequate DCF level 2 background checks on its staff.

Other evidence also requires us to reject this argument. The emails do not reflect a final decision nor a legal opinion regarding an actual application. To the contrary, the emails only show an internal discussion regarding Chabad's contemplated application through an affiliate agreement. In fact, the record does not show that MDCPS made any official decision involving a Chabad application after the emails were sent. And if a decision was made, there is no evidence that it was based on the content of Chabad's speech. Thus, no First Amendment rights are implicated heres.

Chabad has thus only presented conclusory allegations without credible evidence in support of its First Amendment claims. Even when we look at the

11

evidence presented by Chabad in the light most favorable to it, the evidence fails to support the issuance of a preliminary injunction. *See McDonald's Corp.*, 147 F.3d at 1306. Potentially, after further discovery, Chabad could make a First Amendment case based on religious discrimination. But for the Court to grant the extraordinary remedy of a preliminary injunction, Chabad has not met its high burden. Regardless, even if Chabad had demonstrated it was likely to succeed on the merits of its First Amendment claims, it has not shown a substantial threat of irreparable harm.[3]

### B. *Irreparable Injury*

Irreparable harm is the "*sine qua non* of injunctive relief." *Siegel*, 234 F.3d at 1176 (quoting *N.E. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990)). Even where movants establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper. *See Siegel*, 234 F.3d at 1176 (citing *Snook v. Trust Co. Of Georgia Bank of Savannah, N.A.,* 909 F.2d 480, 486 (11th Cir. 1990) (affirming denial of a preliminary injunction even though plaintiff established a likelihood of prevailing because plaintiff failed to meet the burden of proving irreparable injury); *City of Jacksonville,* 896 F.2d at 1285 (reversing preliminary injunction based solely on plaintiff's failure to show irreparable injury); *Flowers Indus. v. FTC,* 849 F.2d 551, 552 (11th Cir. 1988) (same); *United States v. Lambert,* 695 F.2d 536, 540 (11th Cir. 1983) (affirming denial

---

[3] We therefore do not need to determine if Chabad has shown a likelihood of success on its remaining claims.

of preliminary injunction and stating that a plaintiff's "success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm")).

Preliminary injunctive relief is also improper without a finding of likelihood of an "actual and imminent" irreparable injury. *Id.* To satisfy this requirement a movant must show a significant threat of irreparable harm, and not merely rely on remote or speculative injuries. *See, e.g.*, *Ruffin v. Great Dane Trailers*, 969 F.2d 989, 995 (11th Cir. 1992) (holding that an injunction is inappropriate if the possibility of future harm arising from the behavior plaintiff seeks to enjoin is purely speculative); *City of Jacksonville*, 896 F.2d at 1286 (conclusory allegation of irreparable harm in verified complaint and assertion of speculative economic injury at injunction hearing were inadequate to support an injunction order). "Indeed, the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)); *see also Wireless Agents, L.L.C. v. T Mobile USA, Inc.,* 2006 WL 1540587, *3 (N.D. Tex. June 6, 2006) ("[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.").

Here, Chabad argues it is suffering from three forms of irreparable harm: (1) MDCPS's ongoing violation of Chabad's constitutional rights, (2) Chabad's loss of goodwill and participants in CHAP, and (3) Chabad's lost funding from The Children's Trust. Based on the record before us, Chabad has not met its high burden to make this showing. We address each argument in turn.

Chabad first argues that MDCPS's alleged discrimination against the religious content of its speech is per se irreparable harm.[4] Chabad relies on *KH Outdoor, LLC v. Trussville*, 458 F.3d 1261 (11th Cir. 2006) to make this argument, which states that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 458 F.3d at 1271-72 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). The Eleventh Circuit in *KH Outdoor*, however, first found that the plaintiff had succeeded on the merits of its First Amendment argument and that the case involved a "direct penalization" before making the leap that the violation was a per se irreparable injury. *See id.* at 1268-72. Because we have already found that Chabad has failed to demonstrate that it is likely to succeed on the merits of its First Amendment claims, there is no per se irreparable injury.

Next, Chabad argues it is suffering from irreparable injury because of its alleged loss of goodwill and participants in CHAP. For lost participants, Chabad claims it cannot calculate how much money it will lose. This argument is unavailing.

---

[4] Chabad also asserts in a conclusory fashion that violations of its due process and equal protection rights have resulted in per se irreparable injury but provides no legal authority to support the argument.

14

CHAP has been active for approximately ten years, and Chabad should reasonably know how many individuals were expected to participate in CHAP for the 2019-2020 school year based on prior years. There is also a capacity limit based on available facilities, so the maximum number of lost participants is known. Chabad can therefore be compensated through monetary damages if its case is ultimately successful. *See City of Jacksonville, Fla.*, 896 F.2d at 1285 (finding that an injury is 'irreparable' only if it cannot be undone through monetary remedies). Chabad also does not need to make long-range projections, because if appropriate, an injunction may be issued after trial.

Chabad's argument that it has lost goodwill also does not persuade us because Chabad has only made a conclusory statement that this has occurred. *See VAS Aero Services, LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1362 (S.D. Fla. 2012) (an irreparable injury "must be actual and imminent not remote or speculative."). The only specific reference to an incalculable loss of goodwill in Chabad's amended complaint is that its reputation has been severely damaged. But Chabad provides no detail on how this has happened. This conclusory statement fails to meet Chabad's burden to show it has suffered a substantial threat of irreparable injury. *See Palmer,* 287 F.3d at 1329; *see also Commander v. Bowman*, 2009 WL 10666697, at *2 (S.D. Fla. Sept. 28, 2009) (denying a preliminary injunction when a plaintiff only presented evidence of his own subjective worry about his business losing goodwill).

Chabad argues that evidence of loss of goodwill at this stage is not needed, however, and contends that it only needs to produce evidence at an evidentiary

15

hearing. We disagree. If Chabad provided more than a conclusory statement that it lost goodwill, and this was disputed by MDCPS, then an evidentiary hearing may be appropriate. Chabad has not met this initial burden. Chabad also attempts to categorize other potential injuries as loss of goodwill in a single sentence, but each can be remedied by monetary damages (lost donations, contracts, etc.). *See City of Jacksonville*, 896 F.2d at 1285.

Last, Chabad argues that it has lost access to funding from The Children's Trust. Chabad claims it cannot calculate the damages suffered from this loss because "the funds are made available on a per-child basis, and it is impossible, now, to know how many students Chabad [] will have in the future or would have had in the future absent MDCPS's improper actions." For the same reasons we found that Chabad could calculate how many CHAP participants it would have for the 2019-2020 school year, we disagree with Chabad again. Because any shortfall from The Children's Trust that is attributable to MDCPS's alleged wrongful conduct can be compensated through an award of damages, Chabad has failed to show a substantial threat of irreparable harm.

Viewing the facts in the context of a preliminary injunction, which requires a party to show that it has a *substantial* likelihood of success on the merits and there is a *substantial* threat it will suffer irreparable harm, Plaintiff falls well-short of the mark. While Plaintiff "may very well prevail in the present action in the end," it has not met its heavy burden to warrant a preliminary injunction. *Oce North Am., Inc.*

*v. Caputo*, 416 F. Supp. 2d 1321, 1329 (S.D. Fla. 2006). Thus, the motion should be **DENIED**.

## IV. CONCLUSION

In the end, the purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Because entry of a preliminary injunction constitutes "an extraordinary and drastic remedy" not to be granted unless a party clearly establishes all of the prerequisites supporting such relief, *Robertson*, 147 F.3d at 1306, we **RECOMMEND** that the motion be **DENIED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the Honorable Robert N. Scola, United States District Judge. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Comm'r of Soc. Sec.,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 23rd day of September, 2020.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge