United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Chabad Chayil, Inc., Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| The School Board of Miami-Dade County Florida and Miami-Dade County, Office of Inspector General, Defendants. | ) Civil Action No. 20-21084-Civ-Scola |

### Order Granting Motions to Dismiss

Plaintiff Chabad Chayil, Inc., complains Defendants The School Board of Miami-Dade County, Florida (the "School Board") and the Miami-Dade County, Office of Inspector General (the "OIG"), violated its rights with respect to an OIG investigation, the OIG's resulting reports, and, ultimately, the School Board's denying Chabad Chayil's access to School Board facilities. (Am. Compl., ECF No. 27.) In its sixty-page amended complaint, Chabad lodges four claims against the School Board alone: one claim, under 42 U.S.C. § 1983, for violating its free-expression rights under the U.S. Constitution, and three claims under Florida law; and four claims against the Defendants together: three claims under § 1983 for violating its free-exercise, equal protection, and procedural-due-process rights under the U.S. Constitution; and one claim for violating its due-process rights under the Florida Constitution. (*Id.* ¶¶ 195–254.) The complaint also seeks an injunction, as well as declaratory relief. (*Id.* ¶¶ 255–66.) The Defendants, separately, seek dismissal of the complaint in its entirety. (OIG's Mot. to Dismiss, ECF No. 49; Sch. Bd.'s Mot. to Dismiss, ECF No. 50.) The OIG argues the complaint fails to establish that the OIG has deprived Chabad Chayil of any constitutional rights. The School Board, in its motion, submits Chabad Chayil has failed to state claims for municipal liability regarding its four § 1983 claims; for violations of its right to the free exercise of its religion and free expression; for equal-protection violations; for due-process violations; or for injunctive or declaratory relief. Chabad Chayil has responded to both motions (Pl.'s Resp. to OIG, ECF No. 54; Pl.'s Resp. to Sch. Bd., ECF No. 55), separately, and the Defendants have replied (OIG's Reply, ECF No. 60; Sch. Bd.'s Reply, ECF No. 61), also separately. After careful review, the Court concludes Chabad Chayil's federal claims should be dismissed with prejudice. And, because jurisdiction is based on federal-question jurisdiction, the Court exercises its discretion to dismiss the remaining state-law claims, without

prejudice. Accordingly, the Court **grants** both motions to dismiss (**ECF Nos. 49, 50**.)

### 1. Background[1]

Chabad Chayil, a non-profit organization, is run by Rabbi Kievman and his wife Layah Kievman. (Am. Comp. ¶ 18, 23.) Through Chabad Chayil, the Kievmans say they fulfill their obligation "to worry about the physical, spiritual, and emotional state" of "each child," regardless of religion. (*Id.* ¶¶ 22, 23.) This obligation arises out of the teachings of the Lubavitcher Rebbe, in accordance with the principles of the Chabad-Lubavitch movement. (*Id.* ¶¶ 18, 22.) Chabad Chayil runs many programs for the Jewish community, as well as others, in northeast Miami-Dade County, including a synagogue, classes on various Jewish topics, a Bar Mitzvah Club, a Bas Mitzvah Club, teen programming, holiday and Shabbat dinners, summer and winter camps, and an afterschool program called Community Hebrew Afterschool Program ("CHAP"). (*Id.* ¶ 19.) CHAP, started by Chabad Chayil in 2008, and available to children of all faiths and regardless of where they attend school, is described as a Jewish culture and Hebrew language afterschool program. (*Id* ¶¶ 23, 24, 27.)

When it first started, in 2008, CHAP served fewer than ten students and was held twice a week at Aventura Waterways K-8 ("Waterways K-8"), a Miami-Dade County public school. (*Id.* ¶ 26.) By the end of the 2019 school year, in contrast, CHAP registered about 200 students, whom it served, in full-time afterschool programs, at both Waterways K-8 as well as at another Miami-Dade public school, Virginia A. Boone Highland Oaks Elementary School ("Boone Elementary"). (*Id.* ¶¶ 26, 28.) At the same time, Chabad Chayil, apparently through other programs, also served several hundred teens at various high schools throughout the county. (*Id.* ¶ 26.)

In 2008, as Rabbi Kievman was launching CHAP, he contacted School Board member Dr. Martin Karp about how to get access to School Board facilities for his program. (*Id.* ¶ 31.) Karp directed Chabad Chayil to the

---

[1] The Court generally accepts the Plaintiff's factual allegations as true for the purposes of evaluating the Defendants' motions to dismiss. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). The Court has also considered extrinsic documents, supplied by the parties, because the supplied documents are central to Chabad Chayil's claim and none of the parties challenges their authenticity. *See Speaker v. U.S. Dept. of Health & Human Services Centers for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010) ("In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged."). The Court considers the facts revealed by the exhibits to be true where those facts are not contradicted by *factual* allegations in the complaint. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007). General and conclusory claims in the complaint cannot overcome conflicting facts disclosed in the exhibits. *Id.*

principal of Waterways K-8, Luis Bello. (*Id.* ¶ 32.) Bello was receptive to the CHAP concept and told Chabad Chayil that he would ask the School Board Facility Use Office which forms would be required. (*Id.* ¶¶ 34–35.) Chabad Chayil says the Facility Use Office gave forms to Bello to give to Chabad Chayil, "indicating that those forms were the appropriate forms for Chabad Chayil to use to apply for access to [School Board] facilities." (*Id.* ¶ 36.) Chabad Chayil says that, "at Bello's direction, Chabad Chayil submitted the forms provided and [the School Board] approved the application for the 2008–09 school year, including an Affiliating Agreement form promulgated by [the School Board]." (*Id.* ¶ 37.) Chabad Chayil says it filled out this same paperwork for the 2009–10 school year, again at Bello's direction. (*Id.* ¶ 40.) During its initial year, Chabad Chayil charged $695 and a registration fee, for CHAP, but also had scholarships available for any child whose family could not afford the cost. (*Id.* ¶ 38.)

In 2009, a school for children with disabilities, Neytz HaChochma ("Neytz"), approached Chabad Chayil, seeking to partner with CHAP to offer a full-time afterschool program for children with special needs. (*Id.* ¶ 41.) Funding for the program was provided by the Children's Trust. (*Id.*) Chabad Chayil says "the funding provided to Neytz allowed Chabad Chayil to cover the cost of running CHAP, the remainder of which was funded by" donations to or debt incurred by Chabad Chayil. (*Id.*) The Children's Trust awarded a grant to Neytz, for the CHAP program, from 2009 through 2014. (*Id.* ¶ 42.) Thereafter, from 2014 through the 2018–19 school year, the grant was awarded directly to Chabad Chayil. (*Id.*)

The year after it began partnering with Neytz, beginning with the 2010–11 school year, Chabad Chayil approached Bello about expanding CHAP into a full-time afterschool program. (*Id.* ¶¶ 43, 44.) In response, Bello gave Chabad Chayil a different form to fill out: the School Board's Application for Temporary Use of School Building Facilities of the Miami-Dade County Public Schools – Temporary Use Agreement ("Temporary Use Agreement"). (*Id.* ¶ 45.)

Thereafter, in 2011, Chabad Chayil had various discussions with Bello as well as Waterways K-8's afterschool director about CHAP's fees and programming. (*Id.* ¶ 46–50.) As a result of those conversations, Chabad Chayil moved its story-hour programming to its own facility and charged a fee that was on par with the fee the afterschool director charged for her similar story-hour program, offered at Waterways K-8. (*Id.* ¶ 49.) Chabad Chayil also agreed, at Bello's prompting, to remove the $695 tuition amount it charged for its two-day-per-week program. (*Id.* ¶ 50.) Although Chabad Chayil acknowledges Bello had complained about Chabad Chayil's profiting from CHAP, while Bello's school received nothing, Chabad Chayil maintains it was never pointedly told

that "it could not charge any fees of any kind" in order to be able to use School Board facilities. (*Id.* ¶¶ 46, 51.) As Chabad Chayil explains it, after the 2009–2010 school year, it did not "charge for any programming that took place at [School Board] facilities," but it did, nonetheless, "seek reimbursement for registration costs, and for costs of books, snacks, security, and for programming that was held at Chabad Chayil's [own] location." (*Id.* ¶ 55.) For the 2017–2018 school year, Chabad Chayil says it "no longer charged a registration fee" but still charged a "books and supply fee." (*Id.* ¶ 56.)

Chabad Chayil says that although it never specifically requested a fee waiver from the School Board to use its facilities, it nonetheless received fee waivers each year, from 2010 through 2019, to operate CHAP's full-time afterschool program at Waterways K-8. (*Id.* ¶¶ 52, 54.) According to Chabad Chayil, the fee waivers were requested by the principals at Waterways K-8 and Boone Elementary, not by Chabad Chayil directly. (*Id.* ¶ 54.)

### A. The OIG's Investigation

At some point, the OIG received an anonymous complaint alleging Karp and his chief of staff, Jerold Blumstein, were improperly helping Chabad Chayil get free access to School Board facilities by falsely claiming that Chabad Chayil does not collect any funds for its aftercare services. (*Id.* ¶ 78; OIG Draft Rep., ECF No. 27-1, 2.) The complaint alleged Chabad Chayil had been, for years, fraudulently filling out School Board paperwork, representing it did not collect any fees for its services, so that it could use School Board facilities for free. (Am. Compl. ¶ 78; OIG Draft Rep. at 2.)

Thereafter, in July 2017, an OIG investigator contacted Chabad Chayil and asked for information about Chabad Chayil, CHAP, and CHAP's participants. (Am. Compl. ¶ 58.) Chabad Chayil says it provided the requested information. (*Id.* ¶ 60.) Once The Children's Trust was told that Chabad Chayil was "under investigation," it denied further funding for CHAP. (*Id.*)

A few months after being first contacted by OIG, in September 2017, School Board Chief Financial Officer Ron Steiger, told Chabad Chayil that it would have to pay $5,058 to use Waterways K-8 for CHAP. (*Id.* ¶ 70.) Chabad Chayil agreed to pay the fee but objected to paying any further fees beyond that. (*Id.* ¶ 71.)

### B. The OIG's Reports

In June 2019, the OIG sent Chabad Chayil a 37-page draft report (plus exhibits) of its investigation. (*Id.* ¶ 72; OIG Draft Rep. at 1–146.) Chabad Chayil characterizes the draft report as inaccurate—both legally and factually—biased,

misguided, and prejudicial, but provides few factual allegations that contradict the report's findings. (*Id.* ¶¶ 73, 80.) The bulk of Chabad Chayil's criticisms focuses on what it refers to as five "false allegations" contained in the draft report: broadly, (1) that Chabad Chayil made misrepresentations to the School Board in order to get free use of its facilities; (2) that Dr. Karp and his chief of staff improperly pressured School Board staff to approve Chabad Chayil's application and fee waivers; (3) that Chabad Chayil circumvented the School Board's application process for running an afterschool program at a School Board facility; (4) that Chabad Chayil improperly operated CHAP without the required Florida Department of Children and Families license; and (5) that Chabad Chayil violated the Jessica Lundsford Act by not doing background checks on its CHAP staff. (*E.g., id.* ¶ 77.)

### (1) *Fees*

First, Chabad Chayil insists that the School Board, contrary to what the OIG claims in its report, has no actual written policy that a user of School Board facilities can only receive a fee waiver if it conducts a "meeting or program [that] is open to the public and free of charge." (*Id.* ¶ 81.) In fact, says Chabad Chayil, the School Board grants "numerous fee waivers to entities running programs that charge[] registration fees, program fees, and/or [a]re not open to the public." (*Id.* ¶ 84.) And no one ever told Chabad Chayil that there was anything necessarily wrong with its charging registration or book fees for its programs. (*Id.*) Instead, says Chabad Chayil, it was entitled to a fee waiver regardless of whether it charged fees and therefore "had no reason to make any misrepresentations." (*Id.* ¶ 90.) Regardless, Chabad Chayil maintains, the school principals are the ones who have to request the fee waivers, not Chabad Chayil. (*Id.* ¶ 93.)

On the one hand, Chabad Chayil acknowledges charging certain fees and says the School Board was certainly aware of those fees because the School Board itself told Chabad Chayil to charge some of them. (*Id.* ¶ 94.) And Chabad Chayil acknowledges that, in an application Chabad Chayil submitted to The Children's Trust, Chabad Chayil stated it charged a monthly fee of between zero and $159. (*Id.* ¶ 95.) Similarly, an email Rabbi Kievman sent to a School Board staff member included a footer saying that CHAP was available for "as low as $39 per month." (*Id.* ¶ 100.) On the other hand, Chabad Chayil complains the OIG's report misconstrued a news story that said Chabad Chayil offered pre- and after-school Hebrew programs for a "nominal fee" because the article was referring to services offered in non-School Board facilities. (*Id.* ¶ 97–98.) Further, despite acknowledging that it charged certain fees, Chabad Chayil also maintains "programming fees were not charged for any programs on

[School Board] property." (*Id.* ¶ 111.) Notably, absent from Chabad Chayil's complaint are any facts contradicting the OIG's finding that Chabad Chayil represented that its meetings were free of charge when they were not.

Second, Chabad Chayil complains that the OIG's estimate of the value of the fee waivers over the years—$1.3 million—was inaccurate. (*Id.* ¶ 103.) Chabad Chayil says the estimate is wrong because (1) it did not compare School Board charges to other organizations for the use of comparable facilities; (2) Chabad Chayil used fewer rooms during the first few years of running CHAP; and (3) Bello required Chabad Chayil to pay a custodian directly. (*Id.* ¶ 103.) Chabad Chayil does not provide its own estimate of the value of the waivers to counter the OIG's estimate.

### (2)  *Pressure from Dr. Karp and Blumstein*

Many of the administrators interviewed by the OIG said they did not feel like either Karp or Blumstein pressured them to approve Chabad Chayil's applications. (*Id.* ¶ 117.) Two administrators did, however: Bello and Kiesha Johnson Cabrera, a School Board director, in charge of facility rentals. (*Id.* ¶¶ 117, 122; Draft Rep. at 15.) The School Board criticized Bello and Cabrera for approving Chabad Chayil's temporary-use and fee-waiver applications. (Am. Compl. ¶ 118.)

Chabad Chayil says, in contrast, Bello "pressured and threatened" it, demanding that Chabad Chayil sponsor school staff breakfasts, pay for advertising, and provide t-shirts for a school staff event. (*Id.* ¶ 124.) Bello also routinely changed around the rooms CHAP was supposed to use and repeatedly reminded the Kievmans that they were just guests in his school. (*Id.*)

### (3) *The School Board's request-for-proposal ("RFP") process*

The OIG's report explains there is only one way an afterschool program should be able to operate in a school: by participating in the School Board's RFP process. (*Id.* ¶ 127.) In fact, as Chabad Chayil acknowledges, Victor Ferrante—a School Board executive director, in charge of, among other things, afterschool programs—sent a briefing to all principals and assistant principals, in 2008, explaining that Temporary Use Agreements should only be used for individuals and entities seeking access to a facility for day, a weekend, or "mix use" during a week, but not for an extended period of time and certainly not for daily use during the school year. (*Id.* ¶ 129; Draft Rep. at 24–25.)

Despite this requirement, according to Chabad Chayil, Ferrante told the OIG "there was at least one afterschool program operating with a [Temporary Use Agreement] and that it is a principal's decision to allow programs at his

school." (*Id.* ¶ 127.) And, Chabad Chayil says it told the OIG about "another entity," which had not gone through the RFP process, that offered an afterschool program. (*Id.* ¶ 134.) Ferrante also said that the only instance in which he would take issue with a fee-based afterschool program "was if one of the vendors approved through the RFP was also offering an afterschool program at that school." (*Id.* ¶ 127.) According to Chabad Chayil, since Waterways K-8 and Boone Elementary only had principal-operated afterschool programs, the principals of those schools—Bello and Saperstein—"were free to allow CHAP to operate." (*Id.*) Chabad Chayil says, indeed, Ferrante told the OIG "that a principal may allow any program in his or her school." (*Id.* ¶ 131.)

### (4) *DCF Licensing*

In its report, the OIG said Chabad Chayil violated Florida Statute section 402.319 by operating CHAP without a DCF license. (*Id.* ¶ 136; Draft Rep. at 31.) OIG relayed, in the report, Chabad Chayil didn't apply for a license from DCF until August 2015. (*Id.* ¶ 137.) Thereafter, as relayed in the report, Chabad Chayil failed its initial DCF inspection because (1) of fire safety violations; (2) of a lack of the required staff credentials; (3) none of its staff members had proper CPR certificates; and (4) its first-aid kit was expired. (*Id.* ¶ 138; Draft Rep. at 31.) The report also pointed out that, once DCF issued a provisional license to Chabad Chayil, Chabad Chayil was only authorized to operate from 3:00 pm to 6:00 pm. (Am. Compl. ¶ 139; Draft Rep. at 32 n. 41.) Despite this restriction, Chabad Chayil operated from 1:30 pm to 6:00 pm. (Am. Compl. ¶ 139; Draft. Rep. at 32 n. 41.)

In contrast, Chabad Chayil believes it had an exemption from needing DCF licensing because it was working with Neytz and Neytz, in turn, itself had an exemption. (Am. Compl. ¶ 140.) According to Chabad Chayil, it explained to the OIG that it had an "exemption letter" from DCF and thought that was sufficient until The Children's Trust told Chabad Chayil that DCF was changing its practice regarding exemptions. (*Id.* ¶ 144.) Further, Chabad Chayil complains the report failed to acknowledge that the fire-safety issue was actually the result of Waterways K-8's failure, not Chabad Chayil's. (*Id.* ¶141.) Absent from Chabad Chayil's complaint, though, are any facts showing that DCF's inspection findings were inaccurate.

### (5) *Background Checks*

The OIG obtained a list of twenty-two Chabad Chayil employees from The Children's Trust. (*Id.* ¶ 146; Draft Rep. at 34.) The Children's Trust, in turn, had gotten the list from Chabad Chayil when Chabad Chayil applied for a

grant, in 2014. (Draft Rep. at 34.) According to the School Board's records, of the twenty-two people on the list, only the Kievmans had ever been properly vetted or issued a School Board identification badge. (*Id.* at 35.) Thereafter, the OIG asked Chabad Chayil directly for a list of all employees who have provided afterschool care at both Waterways K-8, beginning in 2008, and Boone Elementary, beginning in 2016. (Am. Compl. ¶¶ 67, 147; Draft Rep. at 35.) Additionally, the OIG asked Chabad Chayil to provide proof of "Level 2 Background Screening clearance and rescreening clearance." (Draft Rep. at 35.) In response, Chabad Chayil provided the OIG with a list of 52 names (only 9 of which matched the names on the list from The Children's trust). (*Id.* at 35.) Based on the information Chabad Chayil presented to the OIG, it appeared none of those 52 employees had had a Level 2 Background screening before 2015. (*Id.* at 35.) Further, according to the School Board's district director of human resources, none of the 52 employees had ever been issued a school identification badge. (*Id.* at 35.)

This was in apparent contradiction, the OIG found, to three affidavits from Rabbi Kievman, from 2012, 2013, and 2017, on file with the School Board, attesting that all of Chabad Chayil's employees had undergone and passed the Level 2 background screening. (*Id.* at 35.) At the same time, Chabad Chayil says it showed the OIG that Chabad Chayil had run background checks, of some kind, through the Florida Department of Law Enforcement's Volunteer & Employee Criminal History System. (Am. Compl. ¶ 149.) Unfortunately, though, explains Chabad Chayil, the FDLE did not retain any of those background-check records. (*Id.*) Noticeably missing from Chabad Chayil's complaint are any facts suggesting Chabad Chayil's employees had all undergone "Level 2" background screening.

### C. The School Board's Reaction to the OIG Investigation and Report

After the OIG released its draft report, Steiger (the School Board's CFO) told Chabad Chayil it would not be permitted to use School Board facilities for the 2019–2020 school year. (Am. Compl. ¶ 169.) In response, Chabad Chayil complained to the School Board that it should not rely on the OIG's report because it failed to consider Chabad Chayil's response. (*Id.* ¶ 170.) When the School Board refused to reconsider its decision, Chabad Chayil requested an opportunity to speak at an upcoming School Board meeting, on September 4, 2019. (*Id.* ¶¶ 171, 172.) Chabad Chayil says the School Board asked it not to speak at the meeting and "assure[d] Chabad Chayil that an accommodation would be reached" regarding its use of School Board facilities. (*Id.* ¶ 173.) Chabad Chayil says the School Board warned that if Chabad Chayil instead chose to speak publicly, the School Board would no longer consider any

accommodations. (*Id.*) Around this time, it is not clear when, Chabad Chayil says School Board superintendent Alberto Carvalho, at a charitable event, "assured" Chabad Chayil's attorney that the School Board "would work out an accommodation." (*Id.* ¶ 175.)

After the OIG's final report was released, however, Johnson Cabrera denied Chabad Chayil's online reservation request to operate CHAP at either Waterways K-8 or Boone Elementary. (*Id.* ¶¶ 167, 176, 177.) Both Carvalho and Steiger told Chabad Chayil that it would never be allowed to use School Board facilities because the final report concluded that Chabad Chayil made misrepresentations on its temporary-use applications. (*Id.* ¶ 179.)

In seeking a workaround, Chabad Chayil offered to use an affiliating agreement and agreed not to charge any fees, including registration fees. (*Id.* ¶ 178.) Chabad Chayil says that, in response to this offer, Steiger asked someone named Harvey whether the School Board "could properly enter an Affiliating Agreement with Chabad Chayil because it teaches about the Jewish [r]eligion" in its programming. (*Id.* ¶ 180.) Harvey, in turn, according to Chabad Chayil, requested a legal opinion from someone named Garcia regarding any potential conflicts with the Establishment Clause. (*Id.* ¶ 180.) Garcia responded, explaining that he thought entering into an Affiliating Agreement with Chabad Chayil would violate the Establishment Clause. (*Id.*)

At some point, Chabad Chayil and the Kievmans submitted a request to speak at the School Board's October 2, 2019 meeting. (*Id.* ¶ 183.) Carvalho asked them not to speak and, as Chabad Chayil explains it, again "provided them assurances that a resolution would be reached within a few weeks." (*Id.*) Chabad Chayil says it did not speak at the meeting, but it does not appear the School Board changed its position.

**2. Legal Standard**

A court considering a motion to dismiss, filed under Federal Rule of Civil Procedure 12(b)(6), must accept all the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Although a pleading need only contain a short and plain statement of the claim showing that the pleader is entitled to relief, a plaintiff must nevertheless articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)) (internal punctuation omitted). A court must dismiss a plaintiff's claims if it fails to

nudge her "claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### 3. Analysis

In its amended complaint, Chabad Chayil claims the School Board and the OIG violated its rights to the free exercise of religion, equal protection, and procedural due process, and that the School Board violated its right to free expression, contrary to the U.S. Constitution. After careful review, the Court finds Chabad Chayil has failed to state a claim for any of these alleged violations against either the School Board or the OIG for the following reasons.

#### A. Chabad Chayil fails to state any claims for municipal liability against the School Board.

Chabad Chayil insists the School Board violated its constitutional rights (1) through the actions of the School Board's superintendent, CFO, deputy superintendent/COO, and inspector general; and (2) by adopting the unconstitutional rationale of the School Board attorney and deputy School Board attorney. (Pl.'s Resp. to Sch. Bd. at 3.) The School Board, on the other hand, counters that, among other things, Chabad Chayil has failed to allege any actual facts showing that any of the identified School Board officials had final policymaking authority, not subject to further review, such that any of their acts could be considered final, generally applicable policies of the School Board. (Sch. Bd.'s Reply at 2–3.) After careful review of the amended complaint, the Court agrees with the School Board.

As an initial matter, generally speaking, a local-government entity "may only be sued under section 1983 when a plaintiff's injuries are caused by an official policy" of the entity. *Gaviria v. Guerra*, 17-23490-CIV, 2018 WL 1876124, at *5 (S.D. Fla. Apr. 19, 2018) (Altonaga, J.) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). That is, municipalities and other local-government entities are subject to liability under § 1983 and may be sued directly for relief where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. Only if the alleged constitutional violations resulted from a custom, policy, or practice of a local government entity may that entity be held liable. *Id.* at 694; *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987); *see also Farred v. Hicks*, 915 F.2d 1530, 1532–33 (11th Cir. 1990) ("Governmental entities may be held liable under section 1983 when a governmental 'policy or custom' is the 'moving force' behind the constitutional deprivation.") (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

Generally, demonstrating a custom within a municipality requires showing "a persistent and wide-spread practice." *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004). However, "[a]lthough local governments cannot be held liable merely on a theory of respondeat superior, a single decision by an official policymaker can establish the existence of an unconstitutional municipal policy." *Martinez v. City of Opa-Locka, Fla.*, 971 F.2d 708, 713 (11th Cir. 1992) (internal citation omitted). In determining if a single act is sufficient, as Chabad Chayil alleges in this case, the Court is guided by the following principles:

> (1) Municipalities have section 1983 liability only for acts officially sanctioned or ordered by the municipality. (2) Only those municipal officials who have 'final policymaking authority' may subject the municipality to section 1983 liability for their actions. (3) The determination of whether or not a particular official has 'final policymaking authority' is governed by state law, including valid local ordinances and regulations. (4) The challenged action must have been taken pursuant to a policy adopted by the official or officials responsible for making policy in that particular area of the city's business, as determined by state law.

*Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 997 (11th Cir. 1990) (quoting *City of St. Louis v. Prapotnik*, 485 U.S. 112, 123 (1988) (internal quotations omitted)).

Here, Chabad Chayil does not point to a county-wide policy, but instead focuses on the isolated "actions" of the School Board's superintendent, CFO, deputy superintendent/COO, and inspector general, as well as the School Board's adopting the unconstitutional rationale of the School Board attorney and deputy School Board attorney. (Pl.'s Resp. to Sch. Bd. at 3.) Chabad Chayil contends the actions or edicts of these officials "may be fairly said to represent official policy." (*Id.* (quoting *Monell*, 436 U.S. at 694.)  In support, Chabad Chayil asserts it sufficiently alleged facts showing that all these "personnel were charged with implementing policies" and that their acts as "final policymakers" violated Chabad Chayil's constitutional rights. (Pl.'s Resp. to Sch. Bd. at 3.) The Court finds Chabad Chayil's position long on unsupported conclusions while short on particularized facts supporting its claims.

For example, in defending its position, that various School Board officials took unconstitutional actions that subjected the School Board itself to liability, Chabad Chayil points to paragraphs 13 through 17 and 180 of its amended complaint. Those paragraphs, though, are of little help. For example, Chabad Chayil points to its allegation that the OIG "is an agency of a political

subdivision organized under the State of Florida" to show that the School Board is liable for the complained of actions of the OIG. (Am. Compl. ¶ 13.) This allegation, though, is wholly unavailing in establishing that the OIG has any kind of final-policy making authority with respect to Chabad Chayil's claims of wrongdoing against the School Board. Nor has the Court found anything else in the complaint to bolster Chabad Chayil's position that any of the OIG's actions or decisions represent official or final School Board policy. For instance, Chabad Chayil's allegation that the School Board is "liable for the OIG's actions because the OIG serves as [the School Board's] Inspector General under the 2007 Interlocal Agreement between [the School Board] and Miami-Dade County" fails to provide any facts showing that the OIG has actual final policymaking authority with respect to the actions and decisions Chabad Chayil complains about. (Am. Compl. at 45 n. 4.) In sum, Chabad Chayil fails to provide any factual links between the OIG's alleged unconstitutional actions and its alleged final-policymaking authority for the School Board.

Likewise, Chabad Chayil relies on its allegation that Carvalho, the School Board's superintendent, is "responsible for the administration and management of [the School Board]" and "is a final decision maker of the School Board." (Am. Compl. ¶ 14.) Such broad and conclusory allegations, though, simply do not amount to facts sufficient to state a claim that the School Board can be held liable for the complained of actions of the superintendent either. There is no indication from the complaint regarding the contours of the superintendent's final policymaking authority: Chabad Chayil simply shares that the superintendent is *a* School Board final decision maker. Without more specific information, though, it is impossible for the Court to infer that any of the superintendent's complained of actions fell within the contours of that authority.

In a similar vein, Chabad Chayil's reliance on its allegations regarding the School Board's deputy superintendent/COO, Valtena Brown, and the chief officer of the inspector general, Mary Cagle, both miss the mark. While describing both Brown and Cagle as final decisionmakers, Chabad Chayil never charges either of them with any actual wrongdoing. Indeed, based on the Court's comprehensive review of the complaint, Cagle is never even mentioned again, after the introductory paragraphs, and Brown is only referenced one other time—when Chabad Chayil says that she agreed to allow Chabad Chayil to use School Board facilities without paying any fees until the OIG's final report was issued. (Am. Compl. ¶ 166.) Chabad Chayil never alleges that either Brown or Cagle ever violated Chabad Chayil's constitutional rights and so, the Court is at a loss as to how Chabad Chayil believes either of them could have triggered School Board liability.

Finally, Chabad Chayil looks to its allegations regarding Steiger, the School Board's CFO, to establish School Board liability. Chabad Chayil alleges Steiger was "charged with implementing [School Board] policy related to all financial matters . . . and responsible for approving use of [School Board] facilities with authority to make unilateral decisions, not subject to meaningful administrative review." (Am. Compl. ¶ 16.) While at first glance this may appear to satisfy some of the "guiding principles" that the Eleventh Circuit looks to "to evaluate whether a decision of a single official is sufficient to give rise to municipal liability," it ultimately fails on several levels. *Martinez*, 971 F.2d at 713. First, what state law or local ordinance grants "final policymaking authority" to Steiger to decide whether to allow entities to use School Board facilities? Chabad Chayil's complaint does not say. Further, Chabad Chayil's summary conclusion that Steiger's decisions are "not subject to meaningful administrative review" is wholly devoid of any concrete, supporting factual allegations. Further, and most concerning, Chabad Chayil's speculative claims regarding Steiger's status as a final policymaker are contrary to other allegations in the complaint. For instance, Chabad Chayil maintains simultaneously that Brown is "the final decision[]maker regarding the use of [School Board] facilities under [School Board] policy 7.510" and that, at the same time, Steiger has the "authority to make unilateral decisions . . . about access to and rental of [School Board] facilities." (Am. Compl. ¶¶ 15–16.) If Brown has final decision-making authority then any "unilateral decision" Steiger might make himself, is undoubtedly subject to review by Brown. Additionally, elsewhere in the complaint, Chabad Chayil describes the School Board as acting through both Carvalho and Steiger in telling Chabad Chayil that it would no longer be able to use School Board facilities. (*E.g.*, Am. Compl. ¶¶ 179–80, 198, 205, 207, 211–13.) Again, these broad allegations are devoid of supporting facts and, furthermore, detract from Chabad Chayil's position that Steiger alone had final decision-making authority regarding the use of School Board facilities. In sum, Chabad Chayil has failed to allege *facts* establishing that any of the factors set forth in *Martinez* actually apply to implicate School Board liability for any allegedly unconstitutional decision Steiger made.[2]

Because Chabad Chayil has failed to alleged facts showing that any School Board official or staff member was a final policymaker with respect to the decisions or actions that Chabad Chayil maintains were unconstitutional,

---

[2] Because of this shortcoming, Chabad Chayil's contention that the School Board is liable for Steiger and Carvalho's purported adoption of the School Board's attorney's office's allegedly discriminatory determination (that Chabad Chayil may not use School Board facilities based on its religious teachings) is also unavailing.

it cannot establish School Board liability.[3] Accordingly, the Court finds Chabad Chayil has failed to state a claim against the School Board in counts one through four.

### B. Chabad Chayil has failed to allege facts establishing an official OIG policy or custom that would render the OIG liable for the complained of free-exercise violation.

Chabad Chayil says the OIG targeted its religion throughout its investigation and, therefore, violated Chabad Chayil's right to freely exercise its religion. (Pl.'s Resp. to the OIG's Mot., ECF No 54, 3.) The OIG, in arguing Chabad Chayil has failed to allege facts supporting its claim, submits, among other arguments, that Chabad Chayil has not established an official policy of the OIG that would render it liable for the complained of free-exercise claim. (OIG's Mot. at 9.) After careful review, the Court agrees with the OIG: Chabad Chayil's free-exercise allegations are far too threadbare to establish an official OIG policy or widespread custom.

Chabad Chayil doesn't argue that an OIG policymaker's single decision renders the OIG liable, as it argued regarding the School Board. Therefore, as required by *Monell*, to establish municipal liability under § 1983, Chabad Chayil must show an alleged constitutional violation that resulted from an official OIG policy or an OIG custom that is so pervasive it, in effect, has the force of law. *See Monell*, 436 U.S. at 691. In support of its insistence that it has sufficiently alleged an official OIG policy or custom, Chabad Chayil points to its allegations that the OIG "exhibited bias against Chabad Chayil based on its teaching of religion" and that "[t]he OIG pressured numerous people that it was interviewing" to say that Chabad Chayil was violating a fabricated policy by teaching religious topics. (Pl.'s Resp. to OIG's Mot. at 6 (citing Am. Compl. ¶ 151).) According to Chabad Chayil, because it "specifically identified" the OIG as the perpetrator of the alleged constitutional wrongs, its pleading satisfies *Monell*. (Pl.'s Resp. to OIG's Mot. at 6.) The Court disagrees.

First, Chabad Chayil identifies Cagle as "the final decisionmaker for all actions taken by the OIG," but then fails to mention her in its complaint ever again. (Am. Compl. ¶ 17.) Thus, Chabad Chayil's allegation that "the OIG," itself, unconstitutionally pressured people it was interviewing or "exhibited bias against Chabad Chayil" on the basis of its religious teachings, is wholly conclusory: by not specifying any particular acts done by any particular staff

---

[3] Based on this conclusion, the Court declines to address whether Chabad Chayil's claims otherwise allege facts establishing any free exercise, free expression, equal protection, or due process violations against the School Board.

member of the OIG, Chabad Chayil fails to supply enough factual matter to state a claim for relief that is plausible on its face.

Nor has Chabad Chayil supplied any facts from which the Court could discern the existence of some municipal policy or custom that resulted in the alleged free-exercise violation. Simply alleging the OIG exhibited bias or improperly pressured people it interviewed during its investigation is not enough. Instead, a plaintiff must "plead factual content that allows the court to draw the reasonable inference that the [municipal entity] maintained a policy, custom, or practice that contributed to the alleged constitutional violations." *C.F.C. v. Miami-Dade County*, 349 F. Supp. 3d 1236, 1263 (S.D. Fla. 2018) (Williams, J.) (cleaned up). Nothing in Chabad Chayil's complaint would allow the Court to conclude that "the relevant practice is so widespread as to have the force of law" within the OIG. *Craig v. Floyd County, Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (cleaned up). Simply put, in order to state a claim, Chabad Chayil would have to set forth facts showing that a custom or unofficial policy is "such a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Craig*, 643 F.3d at 1310. Chabad Chayil has simply not supplied such facts regarding its free-exercise claims. Accordingly, the Court finds Chabad Chayil has failed to state a claim against the OIG, in count one, for any violation of its free-exercise rights.

### C. The OIG investigation did not violate Chabad Chayil's right to equal protection.

The OIG argues Chabad Chayil cannot maintain its equal protection claim because it fails to set forth facts establishing any valid comparators whom the OIG treated differently than Chabad Chayil. (OIG's Mot. at 10–11.) In opposition, Chabad Chayil points to its allegations that multiple other entities received fee waivers while also charging fees, using temporary-use applications, like Chabad Chayil, but were not targeted for investigation by the OIG. (Pl.'s Resp. to OIG at 6–7.) The Court finds Chabad Chayil's argument misses the mark.

To begin with, the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To prevail on an equal protection claim, a plaintiff must show (1) that it was treated differently from other, similarly situated entities, and (2) that the defendant treated the plaintiff differently for the purposes of discriminating against the plaintiff. *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1314 (11th Cir. 2006). The other similarly situated entities—or comparators—must be alike in all material respects. *Lewis*

*v. City of Union City, Georgia*, 918 F.3d 1213, 1227 (11th Cir. 2019). "[A] valid comparison will turn not on formal labels, but rather on substantive likenesses." *Id.* at 1228. In other words, "a plaintiff and [its] comparators must be sufficiently similar, in an objective sense," such "that they cannot reasonably be distinguished." *Id.* (cleaned up).

Chabad Chayil insists it has satisfied these standards. In support, it points to "numerous entities who collected fees, including the [four] entities listed in paragraph 213" of the amended complaint who were not, in turn, investigated by the OIG, like Chabad Chayil was. (Pl.'s Resp. to OIG at 6.) What Chabad Chayil leaves out, though, is that an anonymous complaint was submitted to the OIG, complaining (1) that Chabad Chayil was receiving special treatment through its relationship with Karp in gaining the free use of school property; and (2) that Chabad Chayil had been fraudulently filling out School Board paperwork, falsely claiming it does not collect funds for participation in its program. (Am. Compl. ¶ 78.) This fact alone readily distinguishes Chabad Chayil from any of the other "numerous entities who collected fees" while also receiving fee waivers. And, unsurprisingly, Chabad Chayil's complaint is devoid of any allegations that the OIG received a similar complaint about any of the other entities that it did not investigate. Because of this, the Court finds Chabad Chayil has failed to carry its burden of alleging a similarly situated entity that was treated differently by the OIG. Accordingly, the Court finds Chabad Chayil has failed to state a claim against the OIG, in count three, for a violation of the Equal Protection Clause.

### D. Chabad Chayil has failed to state a claim against the OIG for a due-process violation.

The OIG argues Chabad Chayil's due process claim against it is deficient for a number of reasons. Among them are (1) Chabad Chayil fails to sufficiently allege any concrete harm associated with its alleged reputational injury and (2) even if it does allege such a harm, it fails to allege facts showing that the OIG is responsible for that concrete harm. In response, Chabad Chayil simply insists it had "a legal entitlement to use [School Board] facilities" and points to its allegations that the School Board told Chabad Chayil that Chabad Chayil would no longer be allowed use of School Board facilities because of the OIG's report. (Pl.'s Resp. at 7–8.) Chabad Chayil's arguments miss the mark.

First, as the OIG points out, in order to succeed on its due process claim, Chabad Chayil must allege facts showing more than just the reputational injury it claims was occasioned by the OIG's defamatory statements. *Paul v. Davis*, 424 U.S. 693, 712 (1976) (holding reputational harms alone do not implicate either a "'liberty' or 'property' interest[] protected by the Due Process

Clause"). Instead, "allegations of injury to reputation" "must be accompanied by a constitutionally recognized injury" in order to state a claim under section 1983 for the violation of due-process rights. *Cypress Ins. Co. v. Clark*, 144 F.3d 1435, 1436 (11th Cir. 1998). "This rule, labeled the 'stigma-plus' standard, requires a plaintiff to show that the government official's conduct deprived the plaintiff of a previously recognized property or liberty interest in addition to damaging the plaintiff's reputation." *Id.* The property or liberty interest must be a "right or status [that] has been previously recognized and protected under state law." *Behrens v. Regier*, 422 F.3d 1255, 1261 (11th Cir. 2005).

Here, the Court agrees with the OIG that Chabad Chayil has not established the loss of a property or liberty interest and therefore cannot show the necessary "plus." Chabad Chayil had no established entitlement to use School Board property. Chabad Chayil was required to apply to use School Board space each year. (*E.g.*, Am. Compl. ¶ 45.) Chabad Chayil even acknowledges that Bello, each year, used the yearly application process as a way to effect "leverage over Chabad Chayil" by threatening not to sign off if "Chabad Chayil did not accede to his wishes." (Am. Compl. ¶ 45.) Further, at the bottom of the temporary-use application Chabad Chayil filled out, was language advising that "[b][efore this agreement becomes official it must bear the designated signatures" of both the principal of the school as well as the superintendent. (*E.g.*, Final Rep., Ex. 10, ECF No. 14-10, 68.) Chabad Chayil has presented no signed, written contract for the 2019–20 school year or afterwards, and, instead, simply alleges that School Board personnel "agreed" to allow Chabad Chayil to use school facilities without paying fees; that Chabad Chayil reserved space online; but that the School Board nevertheless "den[ied] the application before completion of the OIG investigation." (Am. Compl. ¶¶ 166–70.) Without more, Chabad Chayil has failed to allege "allege the deprivation of any fundamental right." *Behrens*, 422 F.3d at 1264. In other words, Chabad Chayil has simply alleged an inchoate expectation rather than a guaranteed tangible or absolute right to use School Board facilities. *See Zisser v. Florida Bar*, 747 F. Supp. 2d 1303, 1317 (M.D. Fla. 2010), *aff'd sub nom. Doe v. Florida Bar*, 630 F.3d 1336 (11th Cir. 2011) (quoting *Reed v. Village of Shorewood,* 704 F.2d 943, 948 (7th Cir.1983) (overruled on other grounds) for the proposition that "property is what is securely and durably yours under state law as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain") (cleaned up).

Furthermore, even if Chabad Chayil had sufficiently alleged a qualifying "plus," any entitlement that Chabad Chayil might have to the use of School Board property was the legal responsibility of the School Board, not the OIG. The Court, therefore, agrees with the OIG that it is not liable under § 1983

where it lacked the power itself to deprive Chabad Chayil of its entitlement. *See Anemone v. Metro. Transp. Auth.*, 410 F. Supp. 2d 255, 269 (S.D.N.Y. 2006) (noting that "where a particular defendant lacks the power to provide process to the plaintiff in connection with the liberty deprivation," that defendant will not be liable for the deprivation of the particular liberty interest). As set forth in Chabad Chayil's complaint, School Board personnel, and not the OIG, denied Chabad Chayil's application to use School Board space. (Am. Compl. ¶¶ 169, 171, 177, 179 (alleging the School Board, "through Carvalho and Steiger eventually told Chabad Chayil that it would never allow Chabad Chayil to use [School Board] facilities" because of the findings in the OIG's report).) Chabad Chayil has not set forth any facts that would allow the Court to infer that the OIG had any legal authority to deprive Chabad Chayil of any constitutional entitlement. Ultimately, Chabad Chayil has not established "[t]he requisite 'causal relation' for a § 1983 claim" because Chabad Chayil's allegation show that "the continuum between" the "action and the ultimate harm is occupied by the conduct of deliberative and autonomous decision-maker[]"—that is, the School Board. *Carruth v. Bentley*, 942 F.3d 1047, 1056 (11th Cir. 2019).

Because Chabad Chayil has failed to establish the "plus" part of the "stigma plus" equation and, even if it had, has failed to establish that the OIG was legally responsible for that "plus," the Court finds Chabad Chayil has failed to carry its burden of alleging its due process claim against the OIG, in count four.

### E. The Court declines to entertain Chabad Chayil's request for declaratory relief.

Chabad Chayil seeks a declaratory judgment "declaring it did not make any misrepresentations on any applications to [the School Board] for facility access and that the allegations that Chabad Chayil knowingly operated without a license and did not conduct background checks on its employees are false, and that a[ School Board] denial of Chabad Chayil's application for the above false reasons is improper." (Am. Compl. ¶ 263.) At bottom, the Court finds the focus of Chabad Chayil's request for relief is backward looking and focused on factual determinations and therefore does not properly state a claim for declaratory relief.

Courts have "ample" discretion whether to entertain a declaratory judgment action. *Kerotest Mfg., Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183-84, (1952). A declaratory judgment is used to clarify legal relations and not to make factual determinations. *Medmarc Cas. Ins. Co. v. Pineiro & Byrd PLLC*, 783 F. Supp. 2d 1214, 1216 (S.D. Fla. 2011) (Marra, J.). Moreover, "if a district court determines that a complaint requesting a declaratory judgment will not

serve a useful purpose, the court cannot be required to proceed to the merits before dismissing the complaint." *Id.* (cleaned up).

Significantly, "a plaintiff seeking . . . declaratory relief must prove not only an injury, but also a real and immediate threat of *future injury* in order to satisfy the 'injury in fact' requirement." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004) (quotation omitted) (emphasis added); *see also Am. Ins. Co. v. Evercare Co.*, 699 F. Supp. 2d 1355, 1359 (N.D. Ga. 2010), *aff'd,* 430 Fed. App'x 795 (11th Cir. 2011) (unpublished) ("The Declaratory Judgment Act is inappropriate to adjudicate past conduct.") That is "[t]he Declaratory Judgment Act, 28 U.S.C. § 2201, is designed to settle 'actual controversies' *before* they ripen into breaches of contract or violations of law." *Bacardi USA, Inc. v. Young's Mkt. Co.*, 273 F. Supp. 3d 1120, 1127 (S.D. Fla. 2016) (Seitz, J.) (emphasis added). "Past injuries alone generally do not establish declaratory judgment jurisdiction." *Id.* at 1128.

Here, Chabad Chayil asks the Court to make factual determinations regarding events that have already transpired. Although Chabad Chayil raises concerns about how the OIG's factual findings might affect it in the future, those factual findings are not the proper subject of a declaratory action and, further, those findings have already been made "and a declaratory judgment should not issue over past conduct alone." *Id.* at 1130. Chabad Chayil is primarily attempting to address past alleged harms resulting from the Defendants' actions which the Court finds is an improper use of an action for declaratory relief.

### 4. Conclusion

For the reasons set forth above, the Court dismisses counts one through four, against the School Board, and counts one, three, and four against the OIG. Because Chabad Chayil's federal claims all fail on their merits, the Court also dismisses Chabad Chayil's request for an injunction, in count nine, on that basis as well. And, as also explained above, the Court declines to entertain Chabad Chayil's request for declaratory relief as set forth in count ten. The Court **dismisses** these claims (**counts one through four and nine and ten**), **with prejudice** because Chabad Chayil has failed to state a claim under Rule 12(b)(6). Further, the Court **denies** Chabad Chayil's requests for **leave to amend**, inserted as afterthoughts, at the conclusion of its oppositions to the Defendants' motions to dismiss: the requests are both procedurally defective and lacking in substantive support. *See Newton v. Duke Energy Florida, LLC,* 895 F.3d 1270, 1277 (11th Cir. 2018) ("[W]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly."); *Avena v. Imperial Salon & Spa, Inc.*,

740 Fed. App'x 679, 683 (11th Cir. 2018) ("[W]e've rejected the idea that a party can await a ruling on a motion to dismiss before filing a motion for leave to amend.") (noting also that "a motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment") (cleaned up). The deadline for amending the pleadings has also long since passed so Chabad Chayil's request is denied as untimely as well. Regarding the remainder of Chabad Chayil's complaint, which seeks relief under state law (**counts five through eight**), the Court declines to exercise supplemental jurisdiction and **dismisses** those state-law claims, **without prejudice**. *Raney v. Allstate Ins. Co.,* 370 F.3d 1086, 1089 (11th Cir. 2004) ("encourage[ing] district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial"). Accordingly, the Court **grants** the Defendants motions to dismiss (**ECF Nos. 49, 50**.)

The Clerk is directed to **close** this case. Any pending motions are denied as moot.

**Done and ordered** at Miami, Florida, on January 22, 2021.

_____
Robert N. Scola, Jr.
United States District Judge